FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA   2006 FEB -3  PM 1: 51

AUGUSTA DIVISION

CLERK _____
SO. DIST. OF GA.

CHRISTOPHER HUGH LUCAS,              )
                                     )
            Plaintiff,               )
                                     )
    v.                               )    CV 104-081
                                     )
GEORGIA CORRECTIONAL HEALTH          )
CARE, et al.,                        )
                                     )
            Defendants.              )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is proceeding *pro se* and *in forma pauperis*, brought the captioned case

pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), 42

U .S. § 12131, *et seq.*, and § 504 of the Rehabilitation Act, 29 U .S.C. § 701, *et seq.*  The

matter is before the Court on Defendants' motion for summary judgment.  (Doc. no. 41).

Plaintiff opposes the motion.  (Doc. nos. 49-54, 56).  For the following reasons, the Court

**REPORTS** and **RECOMMENDS** that Defendants' motion be **GRANTED**, that **FINAL**

**JUDGMENT** be entered in favored of Defendants, and that this case be **CLOSED**.

### I. STATEMENT OF FACTS

#### A.    Plaintiff's Version

In his amended complaint (which superceded and replaced entirely Plaintiff's original

complaint, see, e.g., Malowney v. Federal Collection Deposit Group, 193 F.3d 1342, 1345

n.1 (11th Cir. 1999)), Plaintiff alleges that Defendants violated his rights by: 1) refusing

Plaintiff medical treatment, 2) refusing to accommodate his disability, and 3) in Defendant

P.A. Link's case, by using excessive force against him. (See doc. no. 9; see also doc. no. 52).
Plaintiff, an inmate at Augusta State Medical Prison ("ASMP"), avers that his health
problems stem from painful and debilitating osteoarthritis in his joints, especially his knees.
(Doc. no. 50, pp. 1-3).

According to Plaintiff, as a result of his arthritis, he requires: 1) a bottom bunk, 2)
crutches, 3) properly-sized knee braces, 4) various medications, and 5) permanent "soft shoe"
and "short walk" profiles, 6) a wheelchair, and 7) an extra blanket. (Id. at 4-18). Plaintiff
also suffers from an inguinal hernia and skin cancer. (Id. at 5). According to Plaintiff, in
refusing him his desired profiles and medical treatment, they have discriminated against him
by hampering his access to the dining hall, law library, visitation, mailroom, and other inmate
services and programs at ASMP. (See generally id.).

Plaintiff avers that he has filed grievances regarding his concerns, but Defendants
have failed to take corrective action. In fact, Plaintiff has only succeeded in antagonizing
Defendants; on one occasion, Defendant P.A. Link reportedly became angry with Plaintiff
while Plaintiff was being treated for cancerous lesions on his head and began spraying
Plaintiff's forehead indiscriminately with liquid nitrogen--hence Plaintiff's excessive force
claim against him. (Doc. no. 52, p. 9). As relief, Plaintiff seeks both monetary damages and
injunctive relief.

**B.     Defendants' Version**

In response to Plaintiff's claims, Defendants have submitted affidavits from the
various individual defendants and voluminous institutional records detailing Plaintiff's
healthcare and Defendants' response to his disability. First, Defendant Thompson, a

registered nurse employed by Defendant Georgia Correctional Health Care ("GCHC"), provides that she provided medical care to Plaintiff. Thompson Aff., p. 2 (Defs.' Ex. A (attached to doc. no. 42)). Defendant Thompson saw Plaintiff on December 18, 2001 during a "sick call."  Id.  At this time, Plaintiff requested a profile for crutches and Defendant Thompson referred him to a "mid-level provider" in regard to that request.  Id.; see also Plaintiff's Institutional Medical Records (hereinafter "Defs.' Ex. B" (attached to doc. no. 42)). That same day, Plaintiff saw Defendant Link, a physician's assistant and GCHC employee, in regard to his request for a crutches profile, as well as complaints regarding a "left inguinal hernia." Link Aff., p. 2 (Defs.' Ex. C (attached to doc. no. 42)). Defendant Link issued Plaintiff "permanent crutches for 180 days" and "bilateral knee braces for 180 days."  Id.; see also Defs.' Ex. B. Defendant Link also recommended a surgical consult regarding Plaintiff's hernia. Id.

On January 11, 2002, Defendant Warren, another physician's assistant employed by Defendant GCHC, saw Plaintiff at a "sick call" and gave him: 1) a three-month profile for a bottom bunk, 2) a six-month profile excusing Plaintiff from being required to walk or stand for more than 30 minutes at a time, and 3) a six-month profile stating that Plaintiff could not stoop, bend, or squat. Warren Aff., p. 2 (Defs.' Ex. D (attached to doc. no. 42)); see also Defs.' Ex. B.

Defendant Thompson then saw Plaintiff at another "sick call" on February 26, 2002. Thompson Aff., p. 2. Plaintiff wanted new knee braces.  Id.  As Plaintiff already had "knee brace orders," Defendant Thompson gave Plaintiff "two elastic knee braces which were the proper size." Defendant Thomspon warned Plaintiff that if the braces were too tight, they

3

would have a "tourniquet effect." Id. According to Defendant Thompson, she provided no additional care to Plaintiff and Plaintiff never complained to her that the braces were too small. Id. Also of note, Defendant Thompson disputes Plaintiff's claim that he wrote her a letter on March 27, 2002, complaining that his knee braces did not fit. Id. at 2-3. According to Defendant Thompson, she was not aware of the alleged letter or Plaintiff's complaint until her attorney "showed the letter to [her]." Id. at 3. Defendant Thompson had no further involvement in Plaintiff's medical care.

On March 19, 2002, Plaintiff cancelled a scheduled sick call request, but Defendant Warren nevertheless renewed an existing profile for an extra pillow, and excepted Plaintiff from participation in required "wellness walks" for 180 days. Warren Aff., p. 2; see also Defs.' Ex. B. Later, Defendant Link saw Plaintiff again at a "sick call" on April 17, 2002. Link Aff., p. 2. Plaintiff complained of knee pain, and Defendant Link issued several renewed profiles for: 1) a bottom bunk, 2) no walking or standing for more than 30 minutes, and 3) no pending or stooping. Id.

On May 16, 2002, Defendant Nichols, a medical doctor employed by GCHC and the Medical Director at ASMP, saw Plaintiff for complaints of varicose veins and painful feet. Nichols Aff., pp. 1-2 (Defs.' Ex. E (attached to doc. no. 42)). Defendant Nichols instructed Plaintiff to keep his feet and legs elevated and issued profiles: 1) for soft shoes, and 2) to allow Plaintiff to elevate his feet and legs between 6:00 a.m. and 4:30 p.m. for six months. Id.

On June 2, 2002, Defendant Link saw Plaintiff for renewed complaints of knee pain and for skin cancer. Link Aff., p. 2. Defendant Link referred Plaintiff for a dermatology

4

consult and prescribed Celebrex for Plaintiff's knee pain. Id. On June 13, 2002, Defendant Nichols saw Plaintiff and issued him a profile for an extra blanket for 90 days. Nichols Aff,. p. 2. Soon after, on June 20, 2002, Plaintiff reported to sick call, once again complaining of arthritis in his knees; at this time, Defendant Warren prescribed Percogesic, noting that Plaintiff's peptic ulcer disease ruled out the use of other anti-inflammatories. Warren Aff., p. 2.

On August 15, 2002, Defendant Warren saw Plaintiff again to discuss his hernia and his need for corrective surgery. Id. at 2. Plaintiff stated that he was unwilling to have surgery, and signed a release form to that effect. Id.; see also Defs.' Ex. B. On October 16, 2002, Defendant Link saw Plaintiff regarding complaints for his skin cancer. Link Aff., p. 2. Upon observing "two small lesions of Actinic Keratosis on [Plaintiff's] forehead," Defendant Link scheduled Plaintiff for cryosurgery. Id. On October 23, 2002, Defendant Link performed the surgery by applying liquid nitrogen to the affected area. Id. at 2-3. According to Defendant Link, the surgery does cause stinging, blistering, and some discomfort, but anesthesia is usually not used because the pain lasts only a matter of minutes. Id. at 3. Defendant Link denies Plaintiff's allegation that he actually assaulted Plaintiff with the liquid nitrogen. See id. at 3. Finally, Defendant Link avers that the surgery was successful and that the lesions were resolved by the time Plaintiff had a follow-up appointment on November 6, 2002. Id.; see also Defs.' Ex. B.

However, on February 6, 2003, Plaintiff complained of red patches on his forehead. Link Aff., p. 3. Defendant Link referred him to the dermatologist, Dr. Aton. Id. Dr. Aton saw Plaintiff on June 27, 2003. See Defs.' Ex. B; Warren Aff., p. 3. By October 23, 2003,

5

Dr. Aton had diagnosed the red patches as rosacea, a recurring condition unrelated to Plaintiff's skin cancer or the application of the liquid nitrogen. See id.; see also Link Aff., p. 6.

Plaintiff was also seen by Defendant Warren regarding the red patches. First, on March 4, 2003, Defendant Warren gave Plaintiff profiles limiting his exposure to direct sunlight to 15 minutes and excepting him from being required to stand for more than 15 minutes at a time. Warren Aff., p. 2. On July 2, 2003, Defendant Warren saw Plaintiff at a follow-up appointment to his June 27, 2003, dermatology consult with Dr. Aton. Id.

Meanwhile, Plaintiff was also seen by Defendant Nichols on June 18, 2003, at which time Defendant Nichols gave Plaintiff new profiles for: 1) a bottom bunk, 2) a hernia support, 3) limitations on standing, walking, stooping, bending or squatting, 4) an exemption from the wellness walk, 5) soft shoes, and 6) an exemption from any activity involving prolonged exposure to sunlight. Nichols Aff., p. 2.

A few months later, Defendant Warren saw Plaintiff again, and renewed his profiles for: 1) a bottom bunk, 2) a hernia support, 3) crutches, 4) limitations on standing, walking, bending, or squatting, 5) an exemption from the wellness walk, 6) soft shoes, and 7) an exemption from prolonged exposure to sunlight. Warren Aff., p. 4. On April 3, 2003, Plaintiff was given elastic knee braces for six months, but not by any of the named defendants. Id. at 5; see also Link Aff., p. 5.

On October 10, 2003, Plaintiff submitted two Health Services Request Forms complaining that his extra-blanket profile had not been renewed and stating that he had been given such a profile since 1987. Id. Defendant Warren denied those requests and incensed

6

Plaintiff by responding that Plaintiff had not had such a longstanding profile "at ASMP" and that ASMP staff "did not care what someone else wrote on [Plaintiff's] chart" at another facility. Id. Defendant Warren also explained that no extra-blanket profile would be issued without a medical reason for doing so. Id. According to Defendant Warren, he denied Plaintiff's request to renew the extra blanket profile because he did not believe Plaintiff still needed the blanket. Id. at 3.

Still, on November 7, 2003, Defendant Warren again saw Plaintiff regarding his knee pain; Plaintiff wanted new knee braces, but Defendant Warren apparently refused to give him any. Id. Between January and April 2004, Defendant Warren and Dr. Aton treated Plaintiff for eczema, prescribed medications, and advised Plaintiff to continue to avoid exposure to sunlight. Id. at 3. On April 5, 2004, Defendant Link re-issued several of Plaintiff's profiles, including one limiting his sun exposure and instructing him to a wear a hat outside. Link Aff., p. 6. Plaintiff also continued to get treatment from Dr. Aton and Defendant Link regarding his rosacea. Id.; see also Defs.' Ex. B. Defendant Link also treated Plaintiff regarding a scaly rash on his forehead on November 24, 2004. Link Aff., p. 4.

Meanwhile, on April 30, 2004, Defendant Nichols evaluated Plaintiff and determined that his osteoarthritis would require an orthopaedic consult. Nichols Aff., p. 2. Defendant Nichols also ordered knee X-rays. Id. On May 20, 2004, Defendant Nichols followed up with Plaintiff, put him on glucosamine and chondrontin sulfate. Id. In June and July of 2004, Plaintiff was given "hinged" knee braces on Defendant Nichols's orders. Id.; Link Aff., p. 5. On July 1, 2004, Defendant Nichols saw Plaintiff for reevaluation; at this time, Plaintiff stated that the hinged knee braces were helpful. Nichols Aff., p. 2. On August 19,

7

2004, Defendant Nichols saw Plaintiff again, at which time Plaintiff complained that the Celebrex was causing stomach problems. Id. at 3. At this time, Defendant Nichols determined that Plaintiff's treatment plan was not giving him "significant help" and advised that the only treatment option left to Plaintiff was total knee replacement; an orthopaedic appointment was scheduled for September 23, 2004. Id.

Defendants Nichols, Link, and Warren explain that they were aware prior to April 2004 that Plaintiff had a "longstanding history" of osteoarthritis. Id. at 3; Warren Aff., p. 4; Link Aff., pp. 4-5. Defendants did not refer Plaintiff to a specialist, take X-rays, or take different treatment measures prior to April 2004 because they were hoping that "conservative treatment," rather than the aggressive measure of knee replacement, would be effective. Nichols Aff., p. 4; Warren Aff., p. 4; Link Aff., pp. 4-5. Defendants Warren, Link, and Nichols also explain that, although other practitioners did so, they did not recommend that Plaintiff use knee braces before June 2004 because knee braces aid only problems with lateral movement, while Plaintiff's pain resulted from difficulty with flexion, extension, and weight bearing. Nichols Aff., pp. 3-4; Warren Aff., pp. 4-5; Link Aff., p. 5. As a result, Defendants Link, Warren, and Nichols contend that elastic or hinged braces would have been of minimal benefit to Plaintiff. Nevertheless, because Plaintiff maintained that braces were helpful, they were ordered at various times, and Plaintiff was allowed to keep them. Nichols Aff., p. 4; Link Aff., p. 5; Warren Aff., p. 5.

In addition, Defendant Link admits that he did not issue Plaintiff a short-walk profile before he requested them on September 24, 2004. Link Aff., p. 4. Defendant Link explains that he never considered giving Plaintiff a short-walk profile prior to Plaintiff's request

because Plaintiff had been able to adequately ambulate with his crutches. Id. Defendant Link also offers, although a bit conclusorily, that the short-walk profile had only a minimal impact on the amount of walking Plaintiff needed to get around the prison. Id. Defendant Nichols has explained his agreement with Defendant Link's conclusion. See Nichols Aff., p. 5. Finally, Defendant Nichols has explained that he would not give Plaintiff a wheelchair profile because such profiles are not appropriate for inmates like Plaintiff who can still ambulate and care for their personal needs without help. Id. at 4-5. Indeed, giving an inmate a wheelchair unnecessarily will cause muscle atrophy and weight gain, resulting in a negative rather than positive impact on the inmate's health. Id. Finally, Defendant Nichols explained that Plaintiff has not yet exhausted the best available avenue for his medical care, the aforementioned total knee replacement surgery. Id.

During the time covered by Plaintiff's complaint, Defendants Schofield, Howerton, and Whitaker headed the administrative staff at ASMP. Defendant Schofield was the Warden of ASMP from 1999 until October 2003, at which time Defendant Howerton became Warden. See Schofield Aff. (Defs.' Ex. F); Howerton Aff. (Defs.' Ex. H); Whitaker Aff. (Defs.' Ex. J)(all attached to doc. no. 42). During his tenure as Warden, Defendant Shofield reviewed and denied Plaintiff's Grievance # 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 because he determined that Plaintiff was receiving adequate medical care. See Scofield Aff.; see also Grievance # 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 (Defs.' Ex. G (attached to doc. no. 42)). After taking over as Warden, Defendant Howerton also denied a grievance from Plaintiff, after having concluded that Plaintiff was receiving proper care for his conditions and needs. See Howerton Aff.; see also Grievance # 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 (Defs.' Ex. I (attached to doc. no. 42)).

9

At the times during which Plaintiff filed these grievances, Defendants Wetherington (1999 to January 2003) and Donald (2003 to present) acted as Commissioner of the Georgia Department of Corrections. See Wetherington Aff. (Defs.' Ex. K (attached to doc. no. 42)); Donald Aff. (Defs.' Ex. L (attached to doc. no. 42)).  However, these Defendants did not personally review Plaintiff grievances; rather, a member of their respective staffs reviewed Plaintiff's grievance appeals. See Wetherington Aff.; Donald Aff.  These Defendants also categorically deny taking any action which had a detrimental impact upon Plaintiff's medical care or treatment at ASMP.  See generally Wetherington Aff.; Donald Aff.

Meanwhile, throughout the period covered by Plaintiff's complaint, Defendant Whitaker was Deputy Warden of Care and Treatment at ASMP.  See Whitaker Aff. Defendant Whitaker was also Chairman of the Classification Committee and made decisions regarding Plaintiff's housing assignment. Id.  On December 12, 2001, in consideration of Plaintiff's various needs, the Classification Committee assigned Plaintiff to "Dormitory 14." In fact, Plaintiff has been housed in "Dormitory 14" throughout his time at ASMP because "Dormitory 14" is the only non-hospital dormitory at ASMP that does not have stairs. Id. Thus, placement in another dormitory at ASMP, other than a hospital dormitory, would have required Plaintiff to negotiate stairs whenever he left or reentered the dormitory. Id.

Based on this record, Defendants contend that they are entitled to judgment as a matter law.  For the following reasons, the Court agrees.

## II. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material

10

fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Applicable substantive law identifies which facts are material in a given case.[1] Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials

on file, that there are no genuine issues of material fact to be decided at a trial. Clark v.

Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the burden of proof at trial rests

with the movant, to prevail at the summary judgment stage, the movant must show that, "on

all the essential elements of its case . . . , no reasonable jury could find for the nonmoving

party." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)

(en banc). On the other hand, if the non-moving party has the burden of proof at trial, the

movant may prevail at the summary judgment stage either by negating an essential element

of the non-moving party's claim or by pointing to specific portions of the record that

demonstrate the non-moving party's inability to meet its burden of proof at trial. Clark, 929

F.2d at 606-08 (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex

Corp. v. Catrett, 477 U.S. 317 (1986)). Merely stating that the non-moving party cannot

meet its burden at trial is not sufficient. Clark, 929 F.2d at 608. Evidence presented by the

movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S.

at 157.

If the moving party carries the initial burden, then the burden shifts to the non-

---

[1]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important. That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59).  A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

**B.      Merits of Plaintiff's Claims**

    **1.      Excessive Force Claim Against Defendant Link**

First, the Court easily dispenses with Plaintiff's excessive force claim against Defendant Link.  "The Eighth Amendment's proscription of cruel and unusual punishments also governs prison officials' use of force against convicted inmates." Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999).  To prevail on an excessive use of force claim, Plaintiff must satisfy both an objective and subjective component. See Farmer v. Brennan, 511 U.S. 825, 834 (1994).

Objectively, Plaintiff must show that he suffered a "sufficiently serious" deprivation that was harmful enough to establish a constitutional violation. Id.  Although there is no requirement that a plaintiff suffer significant injury, "'de minimis' uses of physical force" are beyond constitutional recognition, provided that the use of force is not of a sort "repugnant

12

to the conscience of mankind."[2] Hudson v. McMillian, 503 U.S. 1, 9-10 (1992); see also Riley v. Dorton, 115 F.3d 1159, 1167 (4th Cir. 1997) ("An injury need not be severe or permanent to be actionable . . . but it must be more than *de minimis*."). The Supreme Court has explained that not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Id. (citation omitted)). Subjectively, Plaintiff must show that the actions taken involved the unnecessary and wanton infliction of pain. See Whitley v. Albers, 475 U.S. 312, 319 (1986).

Here, Plaintiff avers that Defendant Link assaulted him by spraying his forehead with liquid nitrogen. In contrast, Defendant Link avers that he properly treated Plaintiff's skin cancer, and that any lingering skin problems on Plaintiff's forehead are due to other skin problems Plaintiff has, such as eczema or rosacea. Other than his own self-serving account of the events, Plaintiff has offered nothing to dispute Defendant Link's evidence. Nor has he presented any evidence showing that he has suffered *any* injury or that Defendant Link used force in a manner "repugnant to the conscience of mankind." Bare allegations of injury are insufficient to withstand a motion for summary judgment. See Crosby v. Monroe County, 394 F.3d 1328, 1335 (11th Cir. 2004)(upholding grant of summary judgment in Fourth Amendment excessive force case where Crosby had nothing more than "bare allegations" to support his claim that he was physically injured).

In addition, the instant suit is governed by the Prison Litigation Reform Act

---

[2]Notably, however, the absence of injury alone, is not a sufficient basis upon which to dismiss an Eighth Amendment claim. Hudson, 503 U.S. at 4-7.

("PLRA"), which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury while in custody without a prior showing of physical injury." 28 U.S.C. § 1997e(e); see also Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003). Section 1997e(e)'s physical injury requirement applies to all federal actions brought by prisoners, even to the extent that the requirement may bar an otherwise cognizable claim of constitutional magnitude. Harris v. Garner, 190 F.3d 1279, 1287-88 (11th Cir. 1999), *vacated in part and reinstated in pertinent part on reh'g* 216 F.3d 970, 984-85 (11th Cir. 2000)(*en banc*). Thus, the PLRA requires a showing of more than *de minimis* physical injury. See Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312-13 (11th Cir. 2002). To illustrate, the Eleventh Circuit has held that bleeding, irritation, and pain caused by forcing an inmate to "dry shave" did not give rise to an action cognizable under the Eighth Amendment and the PLRA. Harris, 190 F.3d at1286-87. The instant case is analogous. In sum, the excessive force claim is devoid of merit.

### 2.    Deliberate Indifference Claims

Plaintiff's claims for deliberate indifference to serious medical needs also fail. To survive Defendants' motion for summary judgment, Plaintiff must produce evidence from which a reasonable jury could conclude: (1) that Plaintiff had an objectively serious medical need, and (2) that Defendants acted with deliberate indifference to that need. Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). Although Plaintiff's osteoarthritis and other health problems show the existence of serious medical needs, Plaintiff has not shown that any Defendant has acted with deliberate indifference to those needs.

14

To show that Defendants were deliberately indifferent to his needs, Plaintiff must offer some proof that Defendants: (1) were subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendants disregarded that risk by (3) following a course of action which constituted "more than mere negligence."  Id.  In addition, the prisoner plaintiff seeking to show that a delay in medical treatment amounted to deliberate indifference "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir.1994), *abrogated in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)); see also Farrow v. West, 320 F.3d 1235, 1244 n.12 (11th Cir. 2003)("In Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court criticized part of the qualified immunity analysis in Hill, but not Hill's analysis of what constitutes a serious medical need of prisoners.").

Of course, it is very clear that Plaintiff is dissatisfied with Defendants' medical care and their treatment decisions, especially regarding Plaintiff's purported need for knee braces, various medical profiles, and an extra blanket.  It is also clear that Plaintiff has a painful and debilitating medical condition.  Nevertheless, it is also clear the Defendants have continually provided Plaintiff with medical treatment, including giving him the requested profiles and knee braces at various times, although apparently not permanently.

In this regard, it should be recognized that the mere fact that a prisoner "may have desired [a] different mode[] of treatment" does not give rise to a claim for deliberate indifference. Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985). "Where a prisoner has received . . . medical attention and the dispute is over the adequacy of treatment,

15

federal courts are generally reluctant to second guess medical judgments." Id. (citation

omitted). Put another way, a mere difference in opinion between prison medical officials and

the inmate as to the latter's diagnosis or course of treatment will not support a claim of cruel

and unusual punishment. Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991); Waldrop

v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989).

    The Court also emphasizes here that "not every claim by a prisoner that he has not

received adequate medical treatment states a violation of the Eighth Amendment." West,

320 F.3d at 1243 (internal quotation and citation omitted).   Furthermore, the Eighth

Amendment does not mandate that the medical care provided to the prisoner "be perfect, the

best obtainable, or even very good." Harris, 941 F.2d at 1510 (quoting Brown v. Beck, 481

F. Supp. 723, 726 (S.D. Ga. 1980)(Bowen, J.)). Only a showing of *deliberate indifference*

gives rise to a constitutional injury. As the Supreme Court has explained:

> [A] complaint that a physician has been negligent in diagnosing or treating
> a medical condition does not state a valid claim of medical mistreatment
> under the Eighth Amendment.   Medical malpractice does not become a
> constitutional violation merely because the victim is a prisoner. In order to
> state a cognizable claim, a prisoner must allege acts or omissions sufficiently
> harmful to evidence deliberate indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

    Here, the record reflects that Plaintiff has received near-constant medical attention

from several healthcare professionals over a period of several years. Throughout the time

Defendants have treated Plaintiff, they have noted his subjective symptoms and tried to

alleviate his pain by issuing numerous profiles and prescribing various medications. Finally,

as a last resort, Defendants have recommended total knee replacement surgery. It should also

16

be noted that Plaintiff has refused Defendants' proposed treatment at least once by refusing to have needed surgery for his hernia. Simply put, the facts are not conducive to any inference that Defendants have behaved with deliberate indifference to Plaintiff's medical needs.

Of course, there is some evidence to suggest that Defendants tire of Plaintiff's constant needs and complaints, such as Defendant Warren's response to Plaintiff's request for an extra blanket, discussed *supra*. Nevertheless, the evidence falls well short of showing a constitutional injury. All evidence indicates that Defendants have provided thorough care for Plaintiff's problems, although they have not always provided Plaintiff with his preferred resolution of his health problems.

The Court also notes that Plaintiff's attempt to hold supervisory officials and entities like Defendants GCHC, Schofield, Whitaker, Howerton, Donald, and Wetherington liable for perceived deficiencies in his medical care must also fail. "Supervisory officials must rely on their subordinate professionals to make competent medical decisions. As long as supervisory officials have no reason to believe that their subordinates are failing to carry out their duties in a competent manner, they should not be held liable for medical decisions over which they have no direct control." Waldrop v. Evans, 681 F.Supp. 840, 851 (M.D. Ga. 1988). In sum, Plaintiff has come forward with no evidence to support his claim that any Defendant has acted with deliberate indifference to his medical needs.

### 3.    ADA/Rehabilitation Act Claims

Finally, Plaintiff's claims for discrimination on the basis of his disability must also

17

fail. "To prove a claim under Title II of the ADA, a plaintiff must establish: (1) that he is a qualified individual with a disability; (2) that he was excluded from the participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such entity; (3) by reason of such disability." Miller v. King 384 F.3d 1248, 1265 (11th Cir. 2004). Similarly, to prove a claim under the Rehabilitation Act, Plaintiff must show: (1) he is handicapped; (2) he is a qualified individual; and (3) he has been excluded from prison programs or activities on account of his disability. Harris, 941 F.2d at 1522. Assuming *arguendo* that Plaintiff otherwise meets the requirements of the ADA and the Rehabilitation Act, the Court is not persuaded that Plaintiff has shown he has been subjected to discrimination.

Plaintiff's sole claim is that because at various times he has been without a wheelchair, knee braces, or a short walk profile, it has been difficult for him to reach various parts of the prison, like the dining hall and the law library. Thus, the sole issue here is whether Defendants have discriminated against Plaintiff by subjecting him to long walking distances which serve to deny him participation in or the benefits of programs, services, or activities at ASMP. Here, Plaintiff's claims fail because he has presented *no* evidence to suggest that he has actually been denied access to any program, service, or activity at ASMP. See Lincoln Cercpac v. Health and Hosps. Corp., 920 F.Supp. 488, 498 (S.D.N.Y. 1996) ("[P]laintiffs here have not defined a service available to the non-disabled that they are being denied by reason of their disability. Accordingly, we find plaintiffs have no substantial likelihood of success on their ADA claims."); Casey v. Lewis, 834 F. Supp. 1569, 1585 (D. Ariz.1993) (plaintiffs failed to establish Rehabilitation Act claim in part because they "did

not identify particular programs from which any of the handicapped inmates were excluded because of their handicaps"). Although Plaintiff avers that it is difficult for him to get around at ASMP, he has not shown that he has missed a single meal, been denied access to the law library, or lost any other opportunity to participate in any ASMP program, service, or activity.

Indeed, the record in this case, already discussed *supra*, belies Plaintiff's contentions. Notably, at Plaintiff's deposition defense counsel asked Plaintiff to specify how Defendants had violated the ADA and the Rehabilitation Act--Plaintiff stated only that Defendants had discriminated against him by failing to provide him with medical care and by not transferring him to Johnson State Prison, a facility where walking distances are purportedly shorter than at ASMP (a claim Plaintiff has not supported). See Pl.'s Dep., pp. 27-30 (Defs.' Ex. N (attached to doc. no. 43)).

These assertions fail as a basis for liability. First, a lawsuit under the ADA or the Rehabilitation Act may not be based on medical treatment decisions. Burger v. Bloomberg, 418 F.3d 882, 882 (8th Cir. 2005)(*per curiam*); see also Fitzgerald v. Corrections Corp. of America,403 F.3d 1134, 1144 (10th Cir. 2005)("purely medical decisions . . . do not ordinarily fall within the scope of the ADA or the Rehabilitation Act") & Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir.1996) (concluding that the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" and that the statute "does not create a remedy for medical malpractice"). Simply put, the Rehabilitation Act and the ADA were never intended to apply to professional decisions involving medical treatment. See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1294 (11th Cir. 2005).

At any rate, as the voluminous record before the Court demonstrates, Plaintiff has not shown that he has been denied medical care. Rather, Plaintiff has received extensive care and has been granted numerous medical profiles in recognition of his medical problems and physical limitations.

In addition, although Plaintiff offers that he must take painful walks to reach various parts of the prison, the Court is not persuaded that Plaintiff's allegations regarding his pain management demonstrate that Plaintiff has been denied access to any of the benefits of any prison program, service, or activity. Indeed, Defendants have shown that they have taken care to house Plaintiff in a particular dormitory so that Plaintiff will not have to climb stairs. The evidence suggests that Defendants have acted in order to accommodate Plaintiff needs, not to discriminate against him. Next, Defendants have also noted that Plaintiff's requested accommodations (*i.e.*, a wheelchair, a short-walk profile, and knee braces) have at times been denied in the past due to medical professionals' determination that these accommodations would have had minimal benefit. Indeed, in the case of the wheelchair, Defendants aver that giving Plaintiff a wheelchair would ultimately damage Plaintiff's long-term health.

Likewise, as to Plaintiff's assertion that transfer to another prison would constitute a reasonable accommodation, the Court notes that the ADA and the Rehabilitation Act do not give inmates a "right of transfer." Miller, 384 F.3d at 1266 n.21. A transfer to another prison is only required when the State elects to comply with the ADA or the Rehabilitation Act by bringing some, but not all, of its facilities into compliance with the law. See id. at 1266. Plaintiff has not shown that ASMP falls short of the requirements of the ADA or the Rehabilitation Act.

In sum, Plaintiff's disability claims fail for lack of proof. Plaintiff's naked accusations regarding his medical care and hampered access to prison programs are no substitute for evidence and do not defeat summary judgment. See Leigh v. Warner Bros. Inc., 212 F.3d 1210, 1217 (11th Cir.2000) (conclusory allegations without specific facts in support have no probative value). Accordingly, Defendants are entitled to judgment on all of Plaintiff's claims as a matter of law.

### III. CONCLUSION

For the reasons explained above, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment (doc. no. 41) be **GRANTED**, that **FINAL JUDGMENT** be entered in favored of Defendants, and that this case be **CLOSED**.[3]

SO REPORTED and RECOMMENDED this 3rd day of February, 2006, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

[3]Having determined that Plaintiff's claims fail on the merits, the Court need not reach Defendants' qualified immunity arguments.